John M. Aufiero v. Commissioner.
Aufiero v. Commissioner
Docket No. 33802.
United States Tax Court
1954 Tax Ct. Memo LEXIS 289; 13 T.C.M. (CCH) 182; T.C.M. (RIA) 54061; February 26, 1954
*289 Petitioner gave to his wife, in trust for two of his children, 2,852 shares of stock of the E. A. Laboratories, Inc., and 149.3 shares of the Aufiero Realty Corporation. He valued such stock on his gift tax return at $70 and $300 per share, respectively. Respondent increased such valuation, and determined a gift tax deficiency. Held, on the date of the gift, the fair-market value of the stock was $72.50 and $330 per share, respectively. William Walzer, Esq., 342 Madison Ave., New York, N. Y., for the petitioner. Thomas R. Charshee, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion This case involves a gift tax deficiency in the amount of $70,608.74 for the year 1947. The only issue is the value of certain shares of common stock which petitioner gave to his wife in trust for two of his children. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. John M. Aufiero (hereinafter referred to as the petitioner) was a resident of Brooklyn, New York, and filed a gift tax return for the gift here involved with the collector of internal revenue for the first district of New *290 York. On January 30, 1947, petitioner gave to his wife, in trust for a son and daughter, 2,852 shares of the common stock of E. A. Laboratories, Inc. (hereinafter referred to as E. A. Lab), and 149.3 shares of the common stock of the Aufiero Realty Corporation (hereinafter referred to as the Realty Co.). The gifts represented 37.5 per cent and 17.66 per cent, respectively, of the outstanding shares of the two companies. The only outstanding class of stock of the two companies was common stock, and they had no bonded indebtedness. Both before and after the gift, all such stock was held by petitioner and members of his immediate family. The stock of neither company was ever listed on any exchange, nor quoted for sale through securities brokers or over-the-counter markets. At no time since the formation of the two companies have any sales of their stock been made between a willing buyer and willing seller dealing at arm's length. E. A. Lab is a New York corporation, organized in 1913. Petitioner was always the company's dominant personality, responsible for production, sales, purchases, and financing. He held the office of president at all times except for a few months in 1942 when *291 one James J. Boylan served nominally in that capacity. Until the early part of 1942, it manufactured automobile accessories, such as horns and heaters. From that time until the latter part of 1945, it manufactured a variety of war materials. In 1946 it resumed the manufacture of automobile accessories and a home space-heater. The business outlook generally and for the automotive-parts industry in particular, was very favorable at the beginning of 1947. The nation had virtually completed the change-over from a war to a peace-time economy. Industrial production for both durable and nondurable goods, while below war-time peaks, was well above the prewar level; and, toward the end of 1946 had taken a marked upward turn from earlier declines in that year. The gross national product in 1946 amounted to 211.1 billion dollars, 4.1 billion dollars below the peak war-year of 1945, but 109.7 billion dollars above the last pre-war year, 1940. The sharp decline in war expenditures was being easily offset by pent-up consumer demand. The size of the gross national product reflected marked increases in prices. In late 1946, price controls were removed, lifting the last of the major war-time economic *292 restraints on business. Capital expenditures were large, and the increased personal income of the war-years, which had gone into savings, provided a large reservoir of buying power for the future. Trends in the automotive-parts industry generally parallel those of the automotive industry as a whole. The automobile manufacturers were producing at an annual rate of 5 million units during the first three weeks of December 1946 - near the all-time peak of 5.5 million reached in 1929. During the 16-year period, 1936-1951, E. A. Lab's net profits, and earnings per share, after taxes, were as follows: Earnings
Year
Net Profits
Per Share **
1936
$ 41,621.48
$ 4.93
1937
7,509.83
.89
1938
( 24,594.45) *
( 2.91)
1939
( 19,731.31)
( 2.34)
1940
( 8,920.91)
( 1.06)
1941
46,699.69
6.14
1942
310,289.20
40.80
1943
121,183.36
15.93
1944
108,641.77
14.29
1945
(171,182.84)
(22.51)
1946
225,432.24
29.64
1947
1,068,442.22
140.49
1948
(404,302.64)
(53.16)
1949
(338,998.24)
(44.58)
1950
16,805.60
2.21
1951
12,041.83
1.58
*293 The company declared a dividend only twice during the 16-year period for which earnings have been shown: one of $4.13 per share in 1946 and one of $5 per share in 1947. Petitioner's salary as president was $50,000 from 1936 to 1939, inclusive, and $40,000 thereafter. On the date of the gift, the company had two outstanding contingent liabilities: (1) a pending suit by the National Labor Relations Board for back wages to some 400 former employees, involving a claim of approximately $200,000; and (2) a deficiency tax notice of approximately $300,000 for the year 1942. Its plant had been closed by strikes from September 22, 1944, to December 11, 1944, and from August 8, 1945, to September 20, 1945. The weighted average earnings-price ratio of ten somewhat comparable companies [1] in the automobile accessories' industry, whose stock was traded in on the exchanges, was 15.22 per cent, based on January 30, 1947, market prices and 1946 earnings. *294 The Realty Co. is also a New York corporation, and was organized in 1939. On January 1, 1941, it exchanged all of its 845 shares of common stock for all of the real property owned by E. A. Lab. Such shares were then exchanged with E. A. Lab stockholders for a corresponding number of E. A. Lab shares. The real property transferred was the plant and offices of E. A. Lab, located in Brooklyn, New York. The Realty Co.'s principal source of income was rent paid to it by E. A. Lab, in the following amounts: Year
Amount
1941
$50,000
1942
72,917
1943
75,000
1944
75,000
1945
80,000
1946
82,500
E. A. Lab also paid all maintenance costs on the property. The Realty Co.'s net profits, earnings and dividends per share, after taxes, as shown by its books, were as follows: Year
Profits
Earnings *
Dividends
1941
$ 9,506
$11.25
$12.00
1942
10,745
12.72
10.00
1943
13,128
15.54
1944
13,952
16.51
1945
15,420
18.25
1946
19,177
22.69
It paid no salary to petitioner, its president; but, from 1941 to 1946, inclusive, paid a salary of at least $10,000 to petitioner's wife, its vice-president, *295 but who performed no services. It also paid approximately $3,700 to John R. Aufiero, its secretary, from 1941 to 1945, inclusive. Of the depreciation claimed on its buildings, the Commissioner disallowed approximately $12,000 in each year from 1943 to 1946, inclusive, to which it did not agree. A similar disallowance for 1942 was agreed upon. On December 31, 1946, the company valued its land and buildings at $1,060,156 less a reserve for depreciation of $399,790. The average earnings-price ratio, based on January 30, 1947, market prices and 1946 earnings for five real estate companies whose common stock was traded on the exchanges, was 7.01 per cent. [2]
On his gift tax return, petitioner valued the E. A. Lab stock at $70 per share and the Realty Co. stock *296 at $300 per share. Respondent determined the deficiency here in issue by a valuation of $150 per share for the E. A. Lab stock and $650 per share for the Realty Co. stock. The fair-market value of the E. A. Lab stock on January 30, 1947, was $72.50 per share, and such value for the Realty Co. stock was $330 per share. Opinion RICE, Judge: Assigning specific fair-market value to shares of stock of corporations, closely held by the members of a single family, is a question of fact. In reaching our conclusion as to the value of the stocks in issue, we have considered, among other relevant factors, the nature and history of the businesses, their earnings, the value of underlying assets, the general economic outlook at the time of the gift, and the market value of stocks of comparable and competing companies within the industries. Both the petitioner and the respondent called expert witnesses. All were well qualified; and, in determining the fair-market value of the stock of the two companies, they considered the above-enumerated factors and others upon which we rely. The valuations which each expert witness placed upon the stocks was almost identical with that of the party which *297 called him to testify. It has thus been our duty to accord to the conflicting testimony the relative weight, which, in our best judgment, it deserves. (C.A. 9, 1948), rehearing denied March 9, 1948. We are satisfied that the petitioner's expert witness carefully considered many relevant factors bearing upon a reasonable approximation of the fair-market value of the E. A. Lab stock. The conclusions of the respondent's witnesses indicate that, while they too have considered more than one factor as a valuation standard, they have relied too heavily on the earnings of only one year or of only admittedly abnormal years. Hence, we have accepted the petitioner's expert's valuation of $72.50 per share as being the fair-market value of the E. A. Lab stock on the date of the gift. Determination of a fair-market value for the stock of the Realty Co. presents a pecularily difficult problem. Such a determination for the stock of any closely-held corporation is not easy. But here, the very nature of the company makes highly improbable the basic premise on which we must proceed - viz., that there could be a willing buyer and a willing seller. *298 The company's assets, with the exception of some cash, and a few United States Bonds, and notes receivable, consisted entirely of the E. A. Lab plant. Its income was almost exclusively derived from the rent which E. A. Lab paid to it. It had no maintenance or upkeep costs, since E. A. Lab paid such costs. Substantial salaries were paid to persons who performed little or no services. The stock, which was the subject of the gift here in question, represented 17.66 per cent of the total outstanding shares. All other shares were held, before and after the gift, by petitioner and members of his immediate family. These factors, together with the company's past earnings record, probable future earnings, the value of its underlying assets, the annual depreciation adjustments which respondent claims should be made, and the earnings of other realty companies have been carefully considered; and we have found that $330 per share represents a reasonable approximation of the fair-market value of the Realty Co. stock on the date of the gift. Decision will be entered under Rule 50. Footnotes
**. Based on 8,450 shares of stock outstanding from 1936 to 1940, inclusive, and 7,605 shares thereafter.↩
*. Parenthesis indicate loss ↩
1. Ainsworth Manufacturing Co., Casco Products Corporation, City Auto Stamping Company, Evans Products Co., McQuay-Norris Manufacturing Co., Modine Manufacturing Co., Muskegon Piston Ring Co., Noblitt-Sparks Industries, Inc., Sterling Aluminum Products, Inc., Universal Products Co., Inc.↩
*. Based on 845 shares outstanding.↩
2. City Investing Company, City Suburban Homes Co., General Realty and Utilities Corporation, Lefcourt Realty Corporation, Tishman Realty & Construction Co. The underlying assets of these companies were not too closely comparable to the industrial plant which comprised Aufiero's principal asset; but their average earnings-price ratio is at least a starting point in developing a fair-market value for the Aufiero stock.↩